Matter of Yetman (2024 NY Slip Op 06205)

Matter of Yetman

2024 NY Slip Op 06205

Decided on December 11, 2024

Appellate Division, Second Department

Per Curiam.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 11, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
BETSY BARROS
VALERIE BRATHWAITE NELSON, JJ.

[*1]In the Matter of John Richard Yetman, an attorney and counselor-at-law. Grievance Committee for the Tenth Judicial District, petitioner; John Richard Yetman, respondent. (Attorney Registration No. 4732210) 

DISCIPLINARY PROCEEDING instituted by the Grievance Committee for the Tenth Judicial District. The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on November 18, 2009.

Catherine A. Sheridan, Hauppauge, NY, for petitioner.
Foley Griffin, LLP, Garden City, NY (Thomas J. Foley of counsel), for respondent.

PER CURIAM.

OPINION & ORDER
The Grievance Committee for the Tenth Judicial District commenced a formal disciplinary proceeding against the respondent by serving and filing a notice of petition dated August 9, 2022, and a verified petition dated August 5, 2022, containing 22 charges of professional misconduct. The respondent served and filed a verified answer dated September 12, 2022, essentially admitting to the factual specifications in the verified petition, and denying the conclusions of law contained therein. The Grievance Committee served and filed a statement of disputed and undisputed facts dated September 22, 2022, with which the respondent concurred. By order dated November 15, 2022, the matter was referred to the Honorable Ralph T. Gazzillo, as Special Referee, to hear and report. A prehearing conference was conducted on December 16, 2022, at which the verified petition was amended by agreement of the parties. Prior to the start of the hearing conducted on February 9, 2023, the parties agreed to further amend the verified petition and the Grievance Committee withdrew charge 21. In his report, the Special Referee sustained the remaining 21 charges in the verified petition. The [*2]Grievance Committee now moves to confirm the Special Referee's report and to impose such discipline upon the respondent as this Court deems just and proper. The respondent submits an affirmation in which he does not oppose the Grievance Committee's motion, but contends that a two-year suspension or, in the alternative, a suspended sentence would be the appropriate sanction.
The Petition
The verified petition, as amended, contains 21 charges of professional misconduct stemming from the respondent's misappropriation of client and third-party funds held in two attorney trust accounts. At all times relevant to the verified petition, the respondent was either an associate or a partner of the law firm Walsh Markus McDougal & DeBellis, LLP (hereinafter the firm), which maintained several attorney trust accounts. Among these, the relevant accounts were an account with Investors Bank with an account number ending in 1767 (hereinafter the Investors account), and an account at Chase Bank with an account number ending in 6268 (hereinafter the Chase account). The respondent and each of the firm's partners were signatories on both of these accounts.
Of the 21 charges in the verified petition, 12 charges (charges 1, 2, 4, 5, 7, 9, 11, 13, 15, 16, 18, and 19) allege that the respondent misappropriated client or third-party funds, in violation of rule 1.15(a) of the Rules of Professional Conduct (22 NYCRR 1200.0). Of those 12 misappropriation charges, 9 charges (charges 2, 4, 5, 7, 9, 11, 13, 16, and 18) constitute instances in which the respondent made a withdrawal from one of the firm's trust accounts when there were no correlating funds on deposit in such account, and no funds were ever received in connection with the related matter, such that the funds were paid, at least in part, against fiduciary funds maintained by the firm in connection with other matters. Based upon the conduct alleged in 6 of the misappropriation charges (charges 2, 5, 7, 9, 13, and 16), the verified petition also includes 6 charges (charges 3, 6, 8, 10, 14, and 17) alleging that the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of rule 8.4(c) of the Rules of Professional Conduct.
Charge 1 alleges that the respondent made the following disbursements from the firm's trust accounts in the following matters: Between August 26, 2016, and July 16, 2018, the respondent issued 8 checks totaling $36,918.24 from the Chase account. Between October 17, 2017, and January 21, 2020, the respondent issued 30 checks totaling $271,231.51 from the Investors account. All of these disbursements were for the respondent's personal use and/or to satisfy debts incurred by the respondent to, among others, American Express, United States Treasury, Prudential, EDA of Mississippi, and two individuals to whom the respondent owed money. At the time each check was paid, there were no correlating funds on deposit in the respective accounts. Therefore, each check was paid, at least in part, against fiduciary funds maintained by the firm in connection with other matters.
Charges 2 and 3 allege that in 2016, the firm represented Glenn Fontaine, a landlord, in a landlord/tenant matter. The respondent handled this matter on behalf of the firm. The respondent advised Fontaine that the tenant had agreed to pay Fontaine the sum of $13,200 to settle the matter. The respondent also told the other firm partners that he had reached a settlement with the tenant. However, no such settlement was reached with the tenant. Nonetheless, in September 2016, the respondent issued a check in the sum of $13,200, payable to Fontaine, from the Chase account, and advised Fontaine that the check represented settlement proceeds, although there were no correlating funds on deposit in the Chase account.
Charge 4 alleges that in 2017, the firm represented Tri-County, a defendant in a wage-and-hour claim litigation. The respondent handled this matter on behalf of the firm. Pursuant to a settlement, Tri-County was to pay the plaintiff a sum certain. In February 2017, the respondent issued a check from the Chase account in the sum of $3,300, payable to Charles Cohen, the plaintiff's counsel, when there were no correlating funds on deposit in the Chase account.
Charges 5 and 6 allege that in 2017, the firm represented Keith Johnson in a title dispute involving real property. The respondent handled this matter on behalf of the firm. Johnson's adversary agreed to settle the dispute, and the respondent falsely advised Johnson that his adversary would settle the matter for an amount that was more than the amount actually offered by the adversary. In June 2017, the respondent issued a check from the Chase account in the sum of $53,465.39, payable to Johnson. The respondent told Johnson that the check represented the settlement proceeds, although there were no correlating funds on deposit in the Chase account.
Charges 7 and 8 allege that in 2017, the firm represented Robert Tanner and Shea Tanner (hereinafter together the Tanners), in the sale of real property. The respondent handled this matter on behalf of the firm. The respondent received the contract deposit from the purchaser, but failed to deposit it in any of the firm's trust accounts. The respondent also failed to advise the Tanners that he had not deposited the contract deposit in any of the firm's trust accounts. When the Tanners alleged that the purchaser had failed to comply with the terms of the contract of sale, the respondent advised the Tanners that the purchaser was willing to settle the dispute for the sum of $12,000, when this was not in fact the case. In November 2017, the respondent issued a check from the Investors account in the sum of $12,000, payable to the Tanners. The respondent advised the Tanners that the funds represented the settlement proceeds, although the purchaser never provided any settlement funds.
Charges 9 and 10 allege that in 2018, the firm represented Margaret Martinson and Robert Martinson (hereinafter together the Martinsons), the plaintiffs in a personal injury matter. The respondent handled this matter on behalf of the firm. The respondent advised the Martinsons that the defendant had agreed to settle the matter, when, in fact, this was not the case. In December 2018, the respondent issued a check in the sum of $34,244.10, payable to the Martinsons, from the Investors account. The respondent advised the Martinsons that the check represented the settlement proceeds from the defendant, although no such funds were ever received by the firm.
Charge 11 alleges that in July 2019, the firm represented Wayne Birdsal in a real estate transaction and a related zoning matter. The respondent handled this matter on behalf of the firm. As part of this representation, the respondent was required to submit a zoning application on behalf of Birdsal, but failed to do so. The respondent did not advise Birdsal of this failure. The respondent issued a check from the Investors account in the sum of $6,500, payable to Bello Architects, for architectural services in connection with the zoning application, although no correlating funds were on deposit. Based upon these allegations, charge 12 alleges that the respondent neglected a legal matter entrusted to him, in violation of rule 1.3(b) of the Rules of Professional Conduct.
Charges 13 and 14 allege that in 2019, the firm represented Matthew Marulis, the owner of a cooperative unit, in a dispute with the cooperative corporation. The respondent handled this matter on behalf of the firm. The respondent advised Marulis that the respondent had reached a settlement with the corporation when, in fact, the respondent had not done so. In August 2019, [*3]the respondent issued a check from the Investors account in the sum of $7,500, payable to Marulis, telling Marulis that the check represented the settlement proceeds, at a time when there were no correlating funds on deposit.
Charge 15 alleges that in 2019, the firm represented Michael Goldstein, a landlord, in a landlord/tenant dispute. The respondent handled this matter on behalf of the firm. The tenant gave the respondent cash in the sum of $7,150 for rent due to Goldstein. The respondent failed to deposit these funds into any of the firm's trust accounts, instead using the funds for the respondent's own use and benefit. However, in October 2019, the respondent issued a check from the Investors account in the sum of $7,150, payable to Goldstein, reflecting the rent due. When this check was paid, there were no correlating funds on deposit in the Investors account.
Charges 16 and 17 allege that in 2019, the firm represented Richard Weiss in an estate matter pending in Surrogate's Court, Nassau County. The respondent handled this matter on behalf of the firm. Weiss was also represented by Daniel Schmitt, an attorney not affiliated with the firm. The respondent advised Schmitt and the partners at the respondent's firm that the respondent had reached a settlement with the adverse party, when, in fact, the respondent had not. In October 2019, the respondent issued a check from the Investors account in the sum of $106,311.96, payable to Schmitt, telling Schmitt that the funds represented the settlement proceeds, when there were no correlating funds on deposit in the Investors account
Charge 18 alleges that in 2019, the firm represented the Nassau County Police Department Federal Credit Union in a foreclosure action. The respondent handled this matter on behalf of the firm. In November 2019, the respondent obtained an official check in the amount of $43,629.62 from the Investors account, payable to Levy & Levy, the holder of a tax lien on the subject property. There were no correlating funds on deposit in the Investors account when the official check was obtained.
Charge 19 alleges that in August 2019, the respondent withdrew cash in the sum of $4,000 from the Investors account for his own use and benefit, which was not related to any client matter. At the time of the withdrawal, there were no correlating funds on deposit in the Investors account. Based upon these allegations, charge 20 alleges that the respondent made a cash withdrawal from his firm's trust account, in violation of rule 1.15(e) of the Rules of Professional Conduct.
Charge 22 alleges that the respondent engaged in conduct that adversely reflects on his fitness as a lawyer, in violation of rule 8.4(h) of the Rules of Professional Conduct, based on the factual specifications underlying charges 1 through 20.
The Hearing Record
The respondent admitted to misappropriating approximately $600,000 in client and third-party funds over a period of more than three years. This figure included the checks identified in charge 1, the majority of which were payments made to satisfy the respondent's personal debts. With regard to the fabricated settlements, the respondent testified that he misrepresented the existence of the settlements rather than "having to deal with motion practice," or where complications arose in his cases for various reasons, including his own failure to fulfill his basic responsibilities, such as deposit a down payment or commence a legal action. In the case of charge 5, the respondent stated that he had "settled" with his client for more than the opposing party was willing to pay, but the respondent never took steps to obtain even the lesser amount that the opposing party had offered.
The respondent explained that he failed to follow the firm's protocol in providing the [*4]firm's bookkeeper with documentation when he deposited or withdrew funds from the attorney trust accounts in order to conceal his misappropriations and avoid questions from the firm's partners or its bookkeeper. However, the respondent's misconduct was eventually uncovered, and he was terminated from the firm, after the firm was contacted regarding insufficient funds in the Investors and Chase accounts in or about February 2020. The respondent admitted that he initially told the firm's managing partner that the insufficient funds were due to the respondent's failure to make a $132,000 deposit. Later, when a transfer made by the managing partner in this amount did not resolve the issue, the respondent provided a story regarding a small part of his misconduct, which was "not wholly true," in order to "kick that proverbial can down the road." Upon the firm's receipt of an insufficient funds notice regarding the Chase account, the respondent then met with the bookkeeper and attempted to transfer funds from one account to another to cover the related shortfall. At this point, the managing partner confronted the respondent and, over the following weeks, the respondent explained the extent of his misconduct to the firm's partners. The respondent further testified that he had reimbursed the firm for all of the funds that he misappropriated, through cashing in his 401(k) account and with the help of his parents.
According to the respondent's testimony, his misappropriations were related to his "long and ugly history" with compulsive gambling, beginning in elementary school with football tickets and continuing until about May 2020. The respondent testified that in 2016, his compulsion became more debilitating and he gambled more frequently, with larger sums of money. The respondent explained that, when he should have been working, his thoughts were consumed by gambling, and he began to abuse alcohol. According to the respondent, his compulsive nature clouded his reasoning such that he believed it was better to hide his mistakes in order to conceal the extent of his misconduct, which led him to use client and third-party funds held by the firm to cover his debts and to pay personal expenses. The respondent and his therapist, whom the respondent has seen nearly every week since May 2020, both reported that the respondent had not gambled since beginning therapy, due to the firm's discovery of the respondent's misappropriations and the onset of the COVID-19 pandemic, which brought sports gambling to a temporary halt. The therapist's evaluation of the respondent revealed diagnoses of alcoholism and persistent and severe compulsive gambling. It should be noted, however, that the respondent admitted that he used the $4,000 cash disbursement from the Investors account to pay a friend's financial obligation.
The Special Referee's Report
In a report dated March 20, 2023, the Special Referee sustained all 21 charges in the verified petition. While the Special Referee found that the respondent "appeared as credible, sincere and genuinely remorseful," the Special Referee noted the severity of the respondent's misconduct. The Special Referee was also "unable to satisfactorily find any logical nexus between [the respondent's] addiction and the way he somewhat cavalierly yet consciously continued to abandon his professional duties and obligations to his clients' matters."
Findings and Conclusions
In view of the evidence adduced, we find that the Special Referee properly sustained all 21 charges in the verified petition. Accordingly, the Grievance Committee's motion to confirm the Special Referee's report is granted. In determining an appropriate measure of discipline, we have considered in mitigation, inter alia, the respondent's repayment of the firm, his previously unblemished disciplinary history, his cooperation with the Grievance Committee, his candor and [*5]remorse, his involvement in therapy to address his compulsive gambling, and the evidence that the respondent presented of his good character. However, in aggravation we have also considered the lengthy duration of the respondent's misconduct (more than three years), the extensive sum which the respondent wilfully misappropriated (approximately $600,000), the respondent's repeated efforts to conceal his misconduct, even after the firm was notified of insufficient funds in two of its accounts, and the respondent's deceit to his clients and his firm in fabricating at least six settlements, two of which entailed checks of at least $50,000 each, for which there were no corresponding funds on deposit. We have further considered that the respondent stopped his misconduct only when it was discovered by his firm and he no longer had access to the firm's trust accounts. By engaging in this misconduct, the respondent exhibited a complete disregard for his fiduciary duties.
Under the totality of the circumstances, we find that disbarment is warranted.
LASALLE, P.J., DILLON, DUFFY, BARROS and BRATHWAITE NELSON, JJ., concur.
ORDERED that the Grievance Committee's motion to confirm the Special Referee's report is granted; and it is further,
ORDERED that the respondent, John Richard Yetman, is disbarred, effective immediately, and his name is stricken from the roll of attorneys and counselors-at-law; and it is further,
ORDERED that the respondent, John Richard Yetman, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, John Richard Yetman, shall desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, John Richard Yetman, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Darrell M. Joseph
Clerk of the Court